324 S.C. 445 (1996)
477 S.E.2d 476
DORCHESTER COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent,
v.
Angela MILLER, natural mother; David Miller, natural father; Johnny Lloyd, natural father, Defendants, of whom Angela Miller is Appellant.
Jessie RICE and Delores Rice, Respondents,
v.
Angela MILLER, Johnny Lloyd, David Miller, Jerome Pinckney and Dorchester County Department of Social Services, Defendants, of whom Angela Miller is Appellant.
No. 2576.
Court of Appeals of South Carolina.
Submitted September 10, 1996.
Decided October 14, 1996.
*447 Frank M. Cisa, Mt. Pleasant, for appellant.
Gina J. McAlhany, Summerville, for respondent Dorchester County Department of Social Services.
Patricia O. DeTreville, Charleston, for respondents Jessie and Delores Rice.
ANDERSON, Judge:
In this case, the family court judge conducted a judicial review hearing to review the status of Shaniqua Lashia Semento, Shequana Miller, and Shia Erra Miller, children who had been removed from the custody of their mother, Angela Miller (Mother), by the Department of Social Services. Miller appeals the family court judge's order finding there was no need to have a treatment plan which addressed the possibility of reunification of Mother with Shaniqua and Shequana. We affirm.[1]

FACTS/PROCEDURAL BACKGROUND
On May 26, 1989, Mother gave birth to Shaniqua Lashia Semento. When Shaniqua was approximately two months old, she was removed from Mother's home and placed into the foster care system because of an incident of "Shaken Baby Syndrome" suffered while in Mother's care. As a result of this incident, Shaniqua suffered permanent brain damage, cerebral palsy, and seizures. Upon release from intensive care for treatment of her injuries, Shaniqua was placed in the foster home of Delores and Jessie Rice. Shaniqua, a special needs child who requires special attention, remained with the Rices for approximately two years. During the two years Shaniqua was in the Rices' care, Mother completed a treatment plan prescribed by the Dorchester County DSS. The plan involved an evaluation, counseling, parenting classes, job training, homemaker aide services, and assistance in finding an apartment. In September of 1991, following her completion of the treatment plan, Mother received custody of Shaniqua.
*448 On November 9, 1991, Shequana Miller was born. At the time, Mother was married to David Miller. In early 1992, Mother took Shaniqua and Shequana to New York where Mother lived with Edward Tuyman, an unrelated male.
In July of 1992, both children were removed from Mother's care by the Orange County DSS in New York. At the time of their removal, Shaniqua had been beaten over 95% of her body and had cigarette burn scars on her back. Additionally, Shequana had a broken nose. Mother testified she had spanked Shaniqua with a belt once for attempting to shove cocoa butter down Shequana's throat. Mother acknowledged Shaniqua had bruises and welts on her legs and back. However, Mother denied Shaniqua had cigarette burns on her back and attributed the scars to ringworm scars. Mother and Edward Tuyman were both charged with assault. Mother pled guilty to one of the assault charges and received a three year sentence of probation.
Subsequently, the Orange County family court found the children had been neglected and ordered the removal of Shaniqua and Shequana from Mother's custody and their placement in the foster care system. The Orange County DSS formulated a treatment plan for Mother. The plan required a psychiatric evaluation, counseling, parenting classes, and Mother's cooperation with a parent aide. With the exception of counseling, Mother completed the treatment plan before she returned to Dorchester County on April 9, 1993.
On May 27, 1993, Shaniqua and Shequana returned to Dorchester County and were placed with the Rices, who had contacted DSS in New York to set up the arrangement. At the time of their return to the Rices' home, Shaniqua had regressed emotionally and physically. Further, she was hostile, hyperactive, self-mutilating, and cruel to the other children in the home, including Shequana.
Dorchester County DSS supervised these children while in the Rices' home although legal custody remained with DSS in New York. Dorchester County DSS accepted legal custody of Shaniqua and Shequana on April 8, 1994. During this time, Mother engaged in weekly visitation under DSS supervision.
*449 Mother has received a psychiatric evaluation, transportation to and from visitation and job interviews, counseling, assistance with housing, and assistance with the cost of food, clothing, and other necessities for the children. The children have been upset by the ongoing contact with Mother. Shaniqua's anxiety reached the point where her schoolwork was adversely affected due to the disruptive behavior she would exhibit for several days prior to and following visitation.
In January of 1994, Mother gave birth to Shia Erra Miller, whose father is Timothy Benjamin. On January 21, 1994, Dorchester County DSS filed a complaint, seeking to intervene to protect Shia Erra from threat of harm in light of the history of physical abuse of the two older children while in Mother's custody. On January 24, 1994, an ex parte order was issued removing Shia Erra from Mother's care.
The Rices filed a motion seeking to intervene and a private adoption action seeking to terminate parental rights, which would enable them to adopt Shaniqua and Shequana. Pursuant to the Rices' motion, a hearing was held on May 26, 1994. By order dated June 20, 1994, the family court judge consolidated the cases of Shaniqua and Shequana, permitted the Rices to intervene, continued the services of the children's appointed Guardians ad Litem, appointed a supervising therapist for Shaniqua and Shequana, and added Jerome Pinckney, the putative natural father, as a defendant.
The judge also ordered:
that all parties be, and all parties hereby are, restrained from providing or obtaining any therapy or therapeutic services for Shaniqua Semento and Shequana Miller until such time as a treatment plan shall be approved in this matter, including but not limited to their participation in "reunification" or "family preservation" programs ....
Pursuant to this order, a treatment plan dated July 19, 1994, was put into effect regarding Shaniqua and Shequana.
In an order dated July 7, 1994, the family court judge addressed DSS's motion to intervene to protect Shia Erra. The court approved a treatment plan formulated by DSS, which required: 1) Mother to continue counseling with Rick Lawhon until released, 2) Mother to accept a referral to a women's therapy group as soon as an opening became available, *450 3) Mother to have a complete psychological evaluation by a licensed clinical psychologist and to follow any and all recommendations for treatment until she is released, 4) Mother to accept a referral to an Anger Management Therapy Program and remain in treatment until released by the therapist. The judge combined all of the cases open on Mother. In his order, the judge further stated "[Mother] shall attend and successfully complete any and all aspects of the treatment plan which is made part of this case."
Subsequently, the Rices filed a motion for judicial review. On January 26, 1995, the family court judge held a hearing on the two cases involving two actions: one brought by DSS against Mother in the interest of the three children and the other brought by the Rices. On that date, the trial judge approved an agreement awarding custody of Shia Erra to the child's paternal grandmother. Therefore, Shia Erra is not involved in this appeal.
At the hearing, Delores Rice testified that when Shaniqua and Shequana returned in May of 1993, Shaniqua was not the same child as when she left. Shaniqua was very violent and aggressive; she bit; she was not as affectionate; and she did not trust adults. During this time, Mother had visited weekly with the children for approximately two hours at the DSS office. At first Shaniqua wanted to go with Mother, but when she returned from the visit she was violent, aggressive, defiant, and would hit everyone in the house. Recently Shaniqua did not want to go, and as a result, became "real clinging." Furthermore, Shaniqua's behavior and problems have affected her school work.
Carol Seltzer, the Guardian ad Litem, became involved in the case beginning May 1994. She observed the children with the Rices on one occasion and felt they appeared to be thriving. She saw the children with Mother at DSS on three occasions. However, because Mother would not speak with her, Seltzer did not form an opinion as to the potential for Mother to be reunited with the children. Seltzer stated she needed to speak with Mother in order to conduct an investigation. Based on her discussion with the children's therapist, the individuals at the children's school and day care, and her observations of the children, Seltzer recommended that Mother *451 no longer have visitation. Mother had not continued to receive counseling as ordered by the family court.
At the time of this hearing, Lavern Martin, a foster care caseworker for DSS, had been involved in this case for approximately one year. She prepared the treatment plan that was submitted to the court the day of the hearing. A previous treatment plan, dated February 21, 1994, had been formulated by the previous caseworker. The February 1994 treatment plan contained recommendations for Mother to follow so she could be reunited with the children.
By order dated February 25, 1995, the court found there was no need to have a treatment plan addressing the possibility of reunification of Mother and the two older children because such reunification was contrary to the best interests of the children. The judge stated in part:
[T]his is a situation involving serious and chronic abuse, a pattern persisting after intervention and after the completion by the mother of two separate Treatment Plans addressing her behavior. The risk of continuing abuse to these children is one which this Court cannot and should not accept.
The judge ordered: 1) Mother barred from any further contact with Shaniqua and Shequana, 2) DSS to cease providing services to Mother with respect to her relationship with the two oldest children, 3) DSS to refrain from any further attempts to rehabilitate or reunite Mother with the two oldest children, and 4) the continued enforcement of the restraining order prohibiting DSS from removing the two children from the Rices' home.

ISSUE
Did the trial court err in failing to require DSS to provide a treatment plan which details what steps will be taken to return the children home, and more particularly, a treatment plan which specifies what obstacles exist to the return of the children, what services Mother will receive, and what actions Mother must take in order to enable her to resume custody as set forth in S.C.Code Ann. § 20-7-764 (1976 & Supp.1995)?

*452 STANDARD OF REVIEW

On appeal from the family court, this Court has jurisdiction to correct errors of law and find facts in accordance with its own view of the preponderance of the evidence. Epperly v. Epperly, 312 S.C. 411, 440 S.E.2d 884 (1994); Chester County Dep't of Social Servs. v. Coleman, 303 S.C. 226, 399 S.E.2d 773 (1990). However, we are not required to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. Cherry v. Thomasson, 276 S.C. 524, 280 S.E.2d 541 (1981). See also McClerin v. McClerin, 310 S.C. 99, 425 S.E.2d 476 (Ct.App. 1992) (Court of Appeals not required to disregard findings of trial judge who is in better position to judge demeanor and veracity of witnesses). Further, this broad scope of review does not relieve the appellant of the burden of convincing this Court that the family court committed error. Skinner v. King, 272 S.C. 520, 252 S.E.2d 891 (1979). Because the appellate court lacks the opportunity for direct observation of the witnesses, it should accord great deference to trial court findings where matters of credibility are involved. See Aiken County Dep't of Social Servs. v. Wilcox, 304 S.C. 90, 403 S.E.2d 142 (Ct.App.1991). This is especially true in cases involving the welfare and best interests of children. Id. See Cook v. Cobb, 271 S.C. 136, 245 S.E. 2d 612 (1978) (the welfare and best interests of children are the primary, paramount, and controlling considerations of the court in all child custody controversies).

LAW/ANALYSIS
Mother argues the trial court erred in failing to require DSS to formulate a treatment plan pursuant to S.C.Code Ann. § 20-7-764 (1976 & Supp.1995), which provides in pertinent part as follows:
§ 20-7-764. Approval of plan for placement of child after removal.
At the close of a removal hearing ... and upon a finding that the child must be removed from the custody of the parent ... to the custody of a public or private agency, the Family Court shall review that agency's proposal and approve *453 a plan for the placement of the child. The agency shall provide the court with a specific plan as to where the child will be placed, what steps will be taken to return the child home, and what action the agency will take to maintain ties between the parent and child. Whenever possible, the plan must be prepared with the participation of the parents, the child, and any other agency or individual that will be required to provide services. The plan must be submitted to the court at the hearing.
Section 20-7-764 requires DSS to formulate a treatment plan "[a]t the close of a removal hearing." The order from which Mother appeals resulted from a judicial review hearing, not a removal hearing. South Carolina Code Ann. § 20-7-766 (Supp.1995) governs review by a family court of the status of a child that has been removed from the home.
A judicial review hearing is not a removal hearing. They are completely separate and distinct proceedings. Further, § 20-7-766 contains no requirement that DSS provide a treatment plan at the close of a judicial review hearing. This requirement only exists at the close of a removal hearing.
Mother's reliance on § 20-7-764 is misplaced. That statute is not applicable in this situation. Thus, her reliance upon the issuance or non-issuance of a treatment plan in this circumstance is ill-placed.
Although no removal hearing regarding Shaniqua and Shequana was held in Dorchester County, a removal proceeding had taken place in New York, resulting in the treatment plan implemented by the Orange County DSS. Dorchester County DSS, in accepting responsibility for Shaniqua and Shequana from the state of New York, properly undertook to implement the Orange County treatment plan.
Mother alleges the only treatment plan formulated by DSS related to Shia Erra. She further contends no treatment plan was ever formulated for Mother and Shaniqua and Shequana. However, Mother has benefited from three separate treatment plans: 1) the 1989 Dorchester County treatment plan; 2) the 1993 Orange County, New York treatment plan; and 3) the 1994 Dorchester County treatment plan, incorporated into the July 7, 1994 order, initially addressing Shia Erra and expanded to include Shaniqua and Shequana.
*454 In 1989, Dorchester County DSS provided Mother a treatment plan upon the removal of Shaniqua after the "Shaken Baby" incident. The Orange County DSS formulated a treatment plan in July 1992, when Shaniqua and Shequana were removed from Mother's care. Mother acknowledges she had not completed the Orange County treatment plan when she returned to Dorchester County in April of 1993. Moreover, because Mother had not yet completed the prescribed treatment plan, the Dorchester County DSS had not closed the transferred case. Further, a treatment plan resulted from the May 5, 1994 hearing involving Shia Erra in which the court ordered that all cases open on Mother and her children be combined.
Based on a preponderance of the evidence, the court, in its February 25, 1995 order concluded there was no need to have a treatment plan in place as the possibility of reunification of Mother with Shaniqua and Shequana was specifically contrary to the best interests of the children.
The trial judge heard testimony from all persons involved in this case, including Mother, the foster parents (Rices), the caseworkers, and the Guardian ad Litem, Carol Seltzer. He was cognizant of the existing pattern of abuse of these children.
The court found:
The nature of the abuse which has been inflicted upon Shaniqua and Shequana, and especially Shaniqua, is particularly severe. Even after rehabilitation and reunification with Shaniqua, the abuse re-occurred with even greater severity, and [Mother] admitted her guilt for this. This child, Shaniqua, has now suffered serious, debilitating and permanent injury at the hands of her natural mother on two separate occasions, the second coming about after her mother completed rehabilitation as directed by the Family Court.
This is not a "spanking" case, or a case involving minor or ineffective discipline. If it were, there might be some cause to consider offering additional rehabilitative services to [Mother]. However, this is a situation involving serious and chronic abuse, a pattern persisting after intervention and after the completion by the mother of two separate Treatment Plans addressing her behavior. The risk of continuing *455 abuse to these children is one which this Court cannot and should not accept.
The focus in this situation appears to have been inappropriately placed on serving the mother's needs. The DSS caseworker currently assigned to the case did not know the nature of the abuse perpetrated upon the children, or even if the mother was responsible for the abuse. In spite of that lack of knowledge, services continued to the mother and reunification was the ultimate object sought by DSS. This focus on the needs of the mother must be replaced with an emphasis on the best interests of these children, as is mandated by statute.
....
There is considerable evidence in this record establishing the inability of [Mother] to either accept responsibility for her own behavior or to make changes in her behavior.
....
There is no need for further Judicial Review as regards [Mother]. There is no need to have a Treatment Plan in place addressing the possibility of reunification of [Mother] with Shaniqua and Shequana, as such reunification is specifically contrary to the best interests of these children.
The question ultimately facing the trial judge is that of the best interest of these two children. The conclusion reached by the trial judge was that Mother could not be entrusted with the care of these children. Nothing in this record indicates the trial judge reached an erroneous decision. Mother has had three chances, through three separate treatment plans in the states of South Carolina and New York, to demonstrate her willingness and capacity to care for these children.

CONCLUSION
The hearing from which this appeal arises was a judicial review hearing. Thus, DSS was not required to submit a treatment plan. Accordingly, the family court judge's order is
AFFIRMED.
HEARN, J., concurs.
CURETON, J., concurs in a separate opinion.
*456 CURETON, Judge (concurring):
While I agree with the results reached by the majority, I write separately because I disagree with the majority's view of some of the facts. Additionally, I disagree with the majority's reasoning in the case.
I note initially that I have been unable to discover the existence of a third treatment plan that affected Shaniqua and Shequana. I do agree that at the time the Orange County Department of Social Services assumed custody of Shaniqua and Shequana, a New York family court entered an order requiring the mother to undergo psychological and psychiatric evaluation, receive counseling, enroll in parenting classes, and cooperate with the "services of a parent aide." However, that order states[1] that custody was placed with the Orange County Department of Social Services "for a period of twelve (12) months." The record does not reflect that the order was extended or that after November 1993, there was a valid New York custody order implementing a treatment plan affecting Shaniqua and Shequana. Nevertheless, I would find that at the time Judge Creech entered the order under appeal, the trial court had jurisdiction over these children by virtue of: (1) the Rices' action to terminate parental rights, (2) Judge Biggs's order of June 20, 1994 which permitted the Rices to intervene in Shia Erra's abuse case, and (3) Judge Biggs's order of July 7th, which consolidated all pending matters into one case. I do not understand the mother now claims that the court did not have jurisdiction over her and the children.
According to the order of Judge Biggs dated June 20, 1994, there was in place a voluntary treatment plan "involving the youngest child only." The order further states "[t]here is no treatment plan involving the two older children, Shaniqua and Shequana." The court concluded that because there was no treatment plan for the two oldest children there "should be no therapy of any kind until such time as a plan is developed, including but not limited to the `reunification' or `family preservation' program." Judge Biggs then ordered a cessation of *457 all therapy to Shaniqua and Shequana "until such time as a treatment plan shall be approved in this matter...." Apparently, there were discussions regarding a treatment plan, but no one submitted anything to the court for approval.
As a consequence of the Dorchester County DSS not proceeding with a plan, the Rices scheduled a judicial review hearing before Judge Creech on January 26, 1995. At that hearing, it was clear that all parties perceived the purpose of the hearing was to present and obtain court approval of a treatment plan for Shaniqua and Shequana. DSS presented a proposed plan to which the mother agreed. The Rices also agreed to the plan, but thought it did not go far enough. The Guardian ad Litem presented a plan of her own. After the hearing, Judge Creech entered an order which concluded "[t]here is no need to have a Treatment Plan in place addressing the possibility of reunification of Angela Miller and Shaniqua and Shequana, as such reunification is specifically contrary to the best interest of these children."
Judge Creech's order is problematical in that it concludes a treatment plan is unnecessary in the face of Judge Biggs's order implicitly requiring a plan be developed. Judge Biggs's order has not been appealed and is the law of the case. Tisdale v. American Life Ins. Co., 216 S.C. 10, 56 S.E.2d 580 (1949). There is a long standing rule in South Carolina that one judge may not overrule another judge of the same court. Charleston County DSS v. Father, 317 S.C. 283, 454 S.E.2d 307 (1995). S.C.Code Ann. § 20-7-764 (Supp.1995) requires a treatment plan be approved by the family court in instances of removal of a child from the custody of a parent or guardian under § 20-7-736 (Supp.1995). DSS purportedly assumed custody pursuant to a New York custody order in April 1994. However, the New York custody order under which Dorchester County DSS assumed custody is not in the record on appeal and, thus, we are not apprised of its terms. In any event, while Judge Biggs's order is the law of the case, the mother was required to argue that fact before the trial court as an issue of res judicata, which she has not done. Carolina Baking Co. v. Geilfuss, 169 S.C. 348, 168 S.E. 849 (1933) (while circuit court judge had no authority to change or modify another circuit court judge's order, the second order is res judicata as to those who sought, consented to or acquiesced in *458 it); see also, Charleston County DSS, 317 S.C. at 291, 454 S.E.2d at 312 (a successor judge has no "discretion" to "reweigh the evidence where the trial judge has made findings of fact supported by evidence in the record").
Assuming, as the mother argues, that § 20-7-764 is implicated when DSS assumes custody from another state and there is not in existence a treatment plan developed pursuant to § 20-7-736, I would nevertheless find § 20-7-764 does not require the development of a treatment plan designed to reunite a parent and child in instances, such as this, where there is overwhelming evidence that to require such a plan would be futile and contrary to the best interests of the children involved.
The purpose of the Child Protection Act is to protect abused and neglected children. S.C.Code Ann. § 20-7-480 (1976). Consistent with that purpose is the legislative mandate to "preserve and stabilize family life, whenever appropriate." Id. Implicit in these policies is the realization that not all parentchild relationships can or should be maintained. Here, a literal reading of § 20-7-764 would require the development of a treatment plan with a view toward reunification of parent and child in every case regardless of the severity of the abuse and neglect and without regard for the practicality of reunification. Surely, the legislature did not intend the family court require the development of a treatment plan designed to reunite a parent and child in cases where to do so would be futile and pose a threat of further harm to the child.
The cardinal rule of statutory construction is to ascertain and effectuate the intention of the legislature. Words of a statute should be given their plain and ordinary meaning without resorting to a subtle or forced construction in order to limit or expand the statute's operation. Mitchell v. Holler, 311 S.C. 406, 429 S.E.2d 793 (1993); Whiteside v. Cherokee County School Dist. No. One, 311 S.C. 335, 428 S.E.2d 886 (1993); Hitachi Data Systems Corp. v. Leatherman, 309 S.C. 174, 420 S.E.2d 843 (1992). However plain and ordinary the words used in a statute, the court will reject their common or usual meaning when to accept it would lead to a result so plainly absurd the legislature could not have intended it. Sheppard v. City of Orangeburg, 314 S.C. 240, 442 S.E.2d 601 *459 (1994). Where it is clear the legislature did not intend the letter of the statute to prevail, the court can consider the spirit of the enactment. Soil Remediation Co. v. Nu-Way Envtl, Inc., 317 S.C. 274, 453 S.E.2d 253 (Ct.App.1994).
I would hold that S.C.Code Ann. § 20-7-764 (Supp.1995) does not require the approval of a plan to reunite a parent and child where, as here, the abuse and neglect is so chronic that there is no realistic possibility that the children can be reunited with their mother and to do so would pose a threat of harm to them and be contrary to their best interests. Such an interpretation of § 20-7-764 is consonant with the policy of the State to free children for adoption who cannot, within a reasonable period of time, be reunited with their parents. See § 20-7-1560 (1976). As a final note, adherence to the requirements of § 20-7-764 should be required in all but the clearly exceptional case. Moreover, even if a plan is not required to include provisions for reuniting the parent and child, that is not to suggest it should not provide for necessary services to the parent and/or child.
NOTES
[1] Because oral argument would not aid the Court in resolving the issues, we decide this case without oral argument.
[1] The order also provides that the "Orange County Department of Social Services will undertake to transfer this matter to the Dorchester County Department of Social Services in South Carolina," but the order does not provide for treatment services to be furnished to the children.