874

McDONALD'S CORPORATION,
Plaintiff,

v.

R. L. MOORE, Defendant.

Civ. A. No. 4727.

United States District Court
W. D. South Carolina,
Spartanburg Division.

Feb. 1, 1965.

———◆———

T. Sam Means, Jr., Spartanburg, S. C., for plaintiff.

Neville Holcombe, Spartanburg, S. C., for defendant.

WYCHE, District Judge.

Plaintiff in this action seeks the recovery of rental overpayments made to the defendant.

The case was tried before me without a jury.

In compliance with Rule 52(a), Rules of Civil Procedure, I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

FINDINGS OF FACT

Plaintiff is an Illinois corporation with its principal office in Chicago, and the defendant and landowner is a citizen of South Carolina.

On January 10, 1961, the plaintiff, then known as Franchise Realty Corporation, as lessee, and defendant, as lessor, entered into a thirty-year written lease for a lot in the City of Spartanburg, South Carolina. The first ten years of the lease provided a monthly rental of Three Hundred, Seventy Five ($375.00) Dollars, the second ten years provided a monthly rental of Four Hundred, Twenty Five ($425.00) Dollars, and the last ten years provided a monthly rental of Four Hundred, Fifty ($450.00) Dollars. In addition to the payment of rent plaintiff was obligated to construct certain improvements on the vacant prop-

erty of the defendant. The improvements were constructed as agreed.

Due to a delay in obtaining a mortgage loan commitment, two months' rent had accrued at the time the plaintiff, at its option, put the lease into effect. Therefore, the first rental check plaintiff sent defendant under the lease was for the months of February and March, 1961, and was paid by the plaintiff in one check for $750.00. The "pegboard" method of accounting was being used by the plaintiff at this time, under which method a carbonized check was used to record the transaction on a subsidiary ledger. In making subsequent disbursements of rental payments, it was the procedure of the employee who wrote the checks to look at the subsidiary sheets, which she had initiated when she wrote the first check, if a check had been written for the prior month, a similar check in a similar amount would be written for the current month. In this instance, the employee saw that on March 23, 1961, a check had been written for $750.00 for the rent, and in April, 1961, when she wrote the check for rent for the month of April, she wrote a check for $750, the amount she had previously written, as shown by Exhibit 4 attached to the deposition of Donald Lear, believing she was paying the rent for one month. After the checks were prepared they were signed either by the Secretary-Treasurer or the Comptroller-Vice-President of the company, believing that the check had been correctly prepared for one month's rent. At the same time each month it was the duty of this same employee to write about one hundred, seventy five checks, as well as the payroll checks, totaling at least two hundred checks, which she did under pressure because of the time element involved.

Each month after March, 1961, plaintiff through an honest mistake mailed to the defendant a check for $750, believing the same to be a check for the monthly rent under the lease, and continued to do so until March, 1964, when an accounting firm who was making an annual certified audit of plaintiff's records, discovered the mistake and the overpayments totaling $13,125.00, and plaintiff thereupon demanded of the defendant a return of the overpayments of rent but defendant refused to make restitution.

The overpayments of rent were made without any claim of right or demand by the defendant and defendant did not claim any right to this overpayment of $375.00 a month at the time they were made.

There is nothing in the rental lease that provides or permits that the monthly rental shall be paid the last ten years of the thirty-year lease in advance, or any other amount in advance. When defendant received the overpayments, in spite of the express terms of the lease, he decided to keep the money. When asked about the April check, the defendant testified, "Q I am asking you about the April check now. It was for $750? A Yes Q And how many months' rent was due under the lease at that time? A Just the one month. Q The one month? A Yes Q In other words, the check was for double the amount of money? A Yes, sir, twice the amount. * * * Q * * * Then, in May of 1961, did you receive a third check? A That's right, sir. Q In what amount? A $750. Q And at that time, how much rent was due under the lease? Or how much—maybe I had better phrase—how much rent had accrued under the lease? A One month. Q And the check was for double that amount? A That's right, sir. * * * A And then what did you do with the excessive payment? A Applied it to the last rental. THE COURT: Applied it where? THE WITNESS: To the last rental. THE COURT: To the last rental? I though you had already applied one to the last rental. THE WITNESS: To the last month—THE COURT: I thought you had already applied one to that. You mean next to the last, don't you? THE WITNESS: Well, next to the last. That would be right. Q Mr. Moore, when you received—THE

COURT: Did you make a record of where you applied that to the lease? THE WITNESS: I have the stubs on it. THE COURT: Did you ever notify the company that you had applied it to the last one? Did you ever write them that? THE WITNESS: No, sir, I did not. * * * Q Now, Mr. Moore, each month since May, 1961, until February, 1964, did you receive from McDonald's Corporation a check for $750? A That's right, sir. Q And how did you credit the excessive payment included in each of those checks? A As I have stated, I would apply $375 to the last month's—THE COURT: Have you got a record of that? THE WITNESS: Well, sir, I have a record, yes. THE COURT: I mean, have you got a record where you applied it? THE WITNESS: I don't have a record of that but I have the checks. THE COURT: There's nothing in writing that you did apply it to it? THE WITNESS: No, sir." When the attorney for the plaintiff telephoned the defendant, long-distance, informing him that the records of the plaintiff indicated that there had been rental overpayments to him, the defendant stated "that he was aware that overpayments had been made, and further stated he was wondering when we would wake up in Chicago".

Defendant was aware of the overpayments of rent but did not give any notice thereof to the plaintiff, either by letter, telegram, telephone, or otherwise, and did not attempt to do so, and did not request his lawyer to do so. When asked why he did not write the plaintiff, he replied, "Well, I don't have a typewriter and I don't have a secretary and I don't write very well." Plaintiff had no notice or knowledge of the overpayment until March, 1964, when the mistake was discovered by an accountant who was making a complete audit for the plaintiff.

Defendant knew at the time he received the second check from the plaintiff for $750, that the plaintiff had made a mistake and was overpaying the rent.

Defendant knew that plaintiff was not intentionally overpaying the rent to be applied to the last years of the thirty-year lease. The $375 overpayment each month was not in the amount of the monthly rental provided in the lease for the last ten years of the lease.

John Haran, Vice President in charge of the Real Estate Department of the plaintiff, who handled the negotiations for the lease with the defendant, left plaintiff's employ at the end of 1961. David C. Lee, Jr. with whom the defendant had telephone conversations concerning the lease, also left the company's employ at the end of 1961.

Plaintiff did not agree for the defendant to apply the overpayments to the last ten years of the thirty-year lease, or to any other term of the lease. After the overpayments were discovered by the plaintiff it offered to allow defendant to apply the overpayments to the rent next to accrue which the defendant refused to do. The letter from defendant's attorney to plaintiff dated sometime subsequent to March 11, 1964, was the first time plaintiff knew of defendant's intention or his idea of applying the overpayments to the last years of the thirty-year lease. When defendant was asked why he credited the overpayments to the last ten years of the lease, he replied, "Well, I had an idea that was customary".

Plaintiff did not knowingly or intentionally make overpayments of rent each month, but the overpayments were an honest mistake of a material fact by an employee in the accounting department of the plaintiff.

Plaintiff has continued to pay rent at the rate of $375.00 per month, as called for under the terms of the lease agreement, since the discovery of the overpayments in March, 1964, and defendant has accepted it as the correct amount of rent due under the lease.

Defendant has not been hurt, his position has not been changed, and he has not suffered any loss by the mistaken overpayments and circumstances have not so changed that it would be inequitable to require him to make full restitution.

The payments under the facts of this case were made under an honest mistake of a material fact and were not voluntary payments but were mistakenly made as the result of forgetfulness, inadvertence, oversight and a clerical error in the preparation of a check for $750 instead of $375, erroneously believing the same to be the rent for one month under the lease, constituting a mistake of fact, and are recoverable. The defendant is not entitled thereto and cannot in good conscience retain the overpayments which would result in unjust enrichment of the defendant at the plaintiff's expense.

## CONCLUSIONS OF LAW AND OPINION

It is difficult to reconcile the various decisions of the South Carolina Supreme Court cited by counsel upon the questions involved in this controversy. Each case must, however, stand upon the facts of the case. The facts in the cases relied upon by defendant are distinguishable from the facts in this case. Therefore, in this case, it seems to me that I should follow the principle laid down in the recent case of Town of Bennettsville v. Bledsoe, 226 S.C. 214, 84 S.E.2d 554, where the Supreme Court of South Carolina said: "The action is at law for money had and received but it is well-settled that equitable principles govern. There is in this case no equity alleged or apparent which offsets the unjust enrichment of appellant at respondent's expense, which would result if he were allowed to retain the overpayment. He is not entitled to it in equity and good conscience, which is the usual test in such cases."

The facts in the Bennettsville case are apposite with the exception that the mistake in that case as to payments was mutual, whereas in the case before me there is no mutuality of mistake, but only a mistake on the part of the payor. Nevertheless, in the case at bar there is no equity alleged or apparent which would offset the unjust enrichment of the defendant at the plaintiff's expense, as the defendant is undertaking to do.

Although an action in assumpsit for money had and received is technically considered an action at law, the action is equitable in nature and is governed by equitable principles. Town of Bennettsville v. Bledsoe, supra; see also, 58 C.J.S. Money Received § 1, citing numerous decisions, both Federal and State, for the principle that an action may be maintained whenever one has money in his hands belonging to another, which in equity and good conscience, he ought to pay over to that other. Equity does not allow an unjust enrichment at the expense of another and restitution is required.

In addition to the Town of Bennettsville case, supra, the South Carolina Supreme Court recognizes the application of equitable principles in such an action, and in Duncan v. McCormick County, 192 S.C. 216, 6 S.E.2d 265, states: "The principle that whenever one has money in his hands belonging to another which in equity and good conscience he ought to pay over to that other an action will lie to recover it, is derived from the civil law and is founded in natural justice. * * * Such an action "may in general be maintained whenever one has money in his hands, belonging to another, which, in equity and good conscience, he ought to pay over to that other." 27 Cyc. 849, and citations. And "the question, in an action for money had and received is: To which party does the money, in equity, justice, and law, belong? All that plaintiff need show is that defendant holds money which, in equity and good conscience, belongs to him. * * *" 27 Cyc. 854, and citations."

The principles followed in the Duncan case were again approved by the South Carolina Supreme Court in Pilot Life Ins. Co. v. Cudd, 208 S.C. 6, 36 S.E.2d 860, 167 A.L.R. 463. The same principles were also recognized in early South Carolina decisions. Glenn v. Shannon, 12 S.C. 570; Bragg v. Thompson, 19 S.C. 572.

I believe that the statement in 40 Am.Jur., Payment, Section 198, page 850,

878

should be applied in determining this case, " * * * it may here be noted that as a general rule, one who pays money to another by mistake *as to the amount* of the obligation or the validity thereof, in such circumstances that the payment does not amount to a waiver, is entitled to recover the amount paid. So, also, one who pays a note under the mistaken belief that he executed it may recover the money so paid, on discovering the mistake, and the drawer of a check for a specified number of cents may, in case it is cashed by mistake for that number of dollars, maintain an action for money had and received against the payee to recover the difference between the amount called for and that collected."

A payment mistakenly made as the result of forgetfulness or inadvertence is a mistake of fact and is recoverable where the person to whom the payment is made is not entitled thereto and cannot in good conscience retain it. 40 Am.Jur., Payment, Sections 194 and 197; Restatement, Restitution, Sections 16 and 18, 70 C.J.S. Payment § 157, et seq.

"It is generally held that the failure of the payor to exercise ordinary care to avoid the mistake under which he made the payment sought to be recovered will not as a matter of law defeat his recovery, and that negligence of the payor in failing to discover the facts will not prevent recovery when the payment was actually made under mistake of fact, unless the payee has changed his position in reliance on the payment * * *." 70 C.J.S. Payment § 157 d.

South Carolina, too, observes that even the negligence of one paying money under a mistake of fact should not, in all cases, preclude the recovery. Atlantic Coast Line Railroad Co. v. Jacob S. Schirmer & Sons, 87 S.C. 309, 69 S.E. 439. Also, in the Town of Bennettsville case, supra, the South Carolin Supreme Court points out in a similar situation of an overpayment, "negligence is no moment because the change of position" by the party to whom the overpayment had been made was "of no consequence". In the case at bar, there is no change

of position by the defendant, alleged or claimed, as the result of the overpayment which would make restitution inequitable.

"Equity recognizes the right to recover money paid through mistake, and the negligence of the payor does not affect the right of such recovery. In other words, if a benefit is bestowed through mistake, no matter how careless or inexcusable the act of the bestower may have been, the recipient of the benefit in equity must make restoration, the theory being that the restitution result in no loss to the recipient. He merely received something for nothing." United States v. Northwestern Nat. Bank & Trust Co., (D.C.Minn.) 35 F.Supp. 484 (1940).

In Atlantic Coast Line R. Co. v. State of Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451, the United States Supreme Court said, "A cause of action for restitution is a type of the broader cause of action for money had and received, a remedy which is equitable in origin and function. * * * The claimant, to prevail, must show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it."

In his answer defendant alleges that the overpayments have been applied by him to the rent for the last years of the thirty-year lease, and asserts that where a debtor at the time of making a payment does not direct the creditor as to which account it should be applied, the creditor is entitled to make the application. This position is not sound for the reason that the rent for the last years of the lease had not accrued and was not due. In the absence of any present debt owed by the plaintiff, the defendant was without any authority or right to retain the overpayments, under the pretense of crediting them against an obligation that would not become due for nearly thirty years.

Applying equitable principles, as I must, the pertinent questions appear to me to be, is the defendant entitled to

the overpayments? Is the retention of the overpayments unconscionable and contrary to equitable principles? Would the retention result in an unjust enrichment of the defendant at the expense of the plaintiff? The answers are obvious. The retention of the money under the circumstances would violate equitable principles and justice. The plaintiff is entitled to recover the overpayments.

In addition to recovery of the overpayments, plaintiff seeks interest from the dates of the respective overpayments.

The general rule is that in suits for the payment of quasi contractual obligations arising from payments of money by mistake, interest is not allowed as a matter of right but depends upon consideration of practical justice and fairness. Board of Com'rs v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361; United States v. Bass, (CA 8) 215 F.2d 9 (1954).

South Carolina has held that interest may be recovered in an action for money had and received. Marvin v. McRae, Cheves 61; Goddard ads. v. Bulow, 1 Nott & McC. 45. In Black v. Goodman & Miller, 1 Bailey 201, the Court held it has a discretionary power over the matter of interest in an action of assumpsit for money had and received, and there allowed interest from the time of the demand.

It seems proper and just to allow interest on the overpayments from the time of the demand for return and I fix the time for the running of interest as April 1, 1964.

This Court has jurisdiction of the parties and of the subject matter. 28 U.S.C.A. § 1332.

Overpayments made through inadvertence and forgetfulness constitute a payment under a mistake of fact and are recoverable.

There has been no change of position on the part of the defendant as a result of the overpayments, and a retention of the overpayments would result in the unjust enrichment of the defendant at the expense of the plaintiff.

This action is controlled by equitable principles, and the equities are with the plaintiff.

Interest on the overpayments is allowed at the rate of six per cent. per annum from the time of the demand of the return of overpayments, and interest shall be computed from April 1, 1964.

Plaintiff is entitled to recover from defendant the sum of Thirteen Thousand, One Hundred, Twenty Five ($13,125.00) Dollars, with interest thereon from April 1, 1964, at the rate of six per cent. per annum.

It is, therefore, ordered, That judgment be entered in favor of the plaintiff against the defendant for the sum of Thirteen Thousand, One Hundred, Twenty ty Five ($13,125.00) Dollars, with interest thereon at the rate of six per cent. per annum, from April 1, 1964.