577 S.E.2d 468

**OKATIE RIVER, L.L.C., Respondent,**

v.

**SOUTHEASTERN SITE PREP, L.L.C., Appellant.**

**No. 3582.**

Court of Appeals of South Carolina.

Heard Dec. 10, 2002.

Decided Jan. 6, 2003.

G. Richardson Wieters, of Hilton Head Island, for appellant.

Frank H. Clabaugh, of Hilton Head Island, for respondent.

ANDERSON, J.

Southeastern Site Prep, LLC (Southeastern) appeals the circuit court's order awarding Okatie River, LLC (Okatie) $85,000 plus interest. We affirm.

## *FACTS/PROCEDURAL BACKGROUND*

Incorporated on December 18, 1996, Okatie was formed for the purpose of acquiring and developing a 927–acre plot of land known as Indigo Plantation in Beaufort County. Richard Covelli (Covelli) was named managing member of Okatie, and G. Duane Deline and Sam Mollet were the principal shareholders. Okatie did not own Indigo Plantation, but it had an option to purchase the property. Okatie obtained the proper zoning to develop the property. However, by January 1997, a lawsuit was filed by a third party which halted all development. During the pendency of the lawsuit, Okatie did not take any steps to develop Indigo Plantation. After the resolution of the lawsuit in December 1997, Okatie determined that it would not develop Indigo Plantation, and it did not exercise its option to purchase. The sole purpose for organizing Okatie no longer existed. Consequentially, Okatie closed its office and dismissed Covelli on December 18, 1997.

While development was on hold at Indigo Plantation, Covelli contacted Thomas Viljac and Steve DeSimone about forming another limited liability company for the purpose of performing site development construction at various developments. On February 25, 1997, articles of organization were filed to create Southeastern. The articles named Covelli as the manager. Covelli participated in discussions to develop an operating agreement for Southeastern and attempted to negotiate an ownership interest in it. The parties could not agree on the operating agreement or on Covelli's percentage of ownership, and they decided that Covelli would not have an active management role. During these discussions, Covelli transferred $85,000 of Okatie's funds to Southeastern as "start up funds." Covelli wrote Southeastern a check for $70,000 on March 14, 1997 and another check for $15,000 on August 26, 1997. Covelli gave Southeastern an additional $15,000 from non-Okatie sources. Southeastern's 1997 tax returns referred to the total $100,000, including the $85,000 from Okatie, as an obligation or loan.

Okatie's principals, Mollet and Deline, did not become aware of the $85,000 transferred to Southeastern until January 1998, when they were wrapping up the business of Okatie. Mollet and Deline contacted DeSimone for the return of the money, and he initially indicated that he thought the money belonged to Covelli. If Covelli did not own the money, DeSimone said Southeastern would return it to Okatie. Viljac and DeSimone later asserted that the money was given to them to secure a discount on work to be performed at Indigo Plantation and refused to return the funds.

When Southeastern filed its 1998 tax return, it again noted that it had an obligation of $100,000. However, Southeastern's accountant made the following notation regarding the tax return:

> The $100,000 "Covelli loan" is comprised of the following:
> 15,000.00 Advanced by Rich Covelli personally
> 85,000.00 Advanced by a partnership which Rich Covelli was formerly a member which was formed for the purpose of developing _____.

Nor [sic] formal documentation exists for these advances. Per Thomas Viljac and Steve Dessimone [sic], these funds were non-refundable advances to be used to offset future costs associated with the partnership's development. Subsequently, the option to develop _____ expired and the partnership has been dissolved. Thomas Viljac has been verbally notified by an attorney representing the partnership concerning repayment of the $100,000. This is as far as it has gone. [Southeastern's] attorney has represented that there is a possible claim to these funds, despite Thomas's position that they are non-refundable. Consequently, we have left the liability on the books as of 12/31/98.

In February 1998, Viljac executed an affidavit concerning his transactions with Covelli. In his affidavit, Viljac stated that Southeastern contracted successfully with Indian Hills, another property development company managed by Covelli, to perform site development. Southeastern performed the work and submitted invoices for work performed.[1] Viljac

---

1. Prior to Okatie's discovery of Covelli's actions, Indian Hills fired Covelli and brought a lawsuit against him, claiming he diverted funds from that company as well.

contended that Covelli gave him funds from Okatie to cover start-up costs, and their understanding was that Okatie would be paid back "solely through a reduced price on any work to be performed at Okatie when it was developed." Viljac also declared:

I further understand that our company's internal financial statements at one point may have reflected the Okatie advances as "capital contributions" by Mr. Covelli. This was a misnomer. In 1997, we changed our accounting software to a new package offered by Peachtree Software which we were still learning, and the internal financial statements are inaccurate. *[Southeastern] currently treats the advances as loans from Mr. Covelli on behalf of Okatie.*

(emphasis added).

Okatie filed a complaint against Southeastern in June 1999. Okatie alleged the $85,000 was "either loaned to, and/or advanced to Southeastern by Covelli, without the knowledge or consent of Okatie's shareholders." The complaint acknowledged that Southeastern variously referred to the money as a loan or as an advance payment for work to be done at Indigo Plantation. Okatie sought return of the funds and interest. The parties stipulated that the sum of $85,000 was in fact a *loan.* At issue in the instant case are the terms, conditions, and obligations of repayment.

At trial, Okatie called Viljac as an adverse witness. He denied that Covelli had any managing authority over Southeastern. Viljac maintained that his oral agreement with Covelli was that Okatie would advance Southeastern $85,000 in exchange for Southeastern agreeing to perform site preparation construction at a reduced cost at the Indigo Plantation development, if Okatie decided to give the work to Southeastern. Following Okatie's decision not to develop Indigo Plantation, Viljac believed Southeastern was not obligated to return the money, stating:

We refuse to refund that money dollar for dollar due to the fact that the agreement between us and Mr. Covelli who controlled that property. The money was to be repaid for a reduction in construction costs on that project. Whether it was to happen tomorrow, a week from tomorrow, 20,000

years from tomorrow, that was the agreement with our company and Mr. Covelli.

Viljac admitted that he called the money a "loan" from Okatie in his previous affidavit.

Viljac attested that Southeastern could have avoided paying back the money by not bidding competitively on work at Indigo Plantation. According to Viljac, the agreement only applied to site preparation work performed on the Indigo Plantation property; therefore, Southeastern would not perform site preparation work for Okatie on another project at a reduced rate pursuant to their agreement. Viljac admitted the agreement with Covelli to perform site construction at a reduced rate did not have a time limit for performance and did not define how the reduced rate would be determined.

Deline averred that although Covelli had authority to enter into a contract for the purchase of the Indigo Plantation property and to get zoning changes, he was not authorized by Okatie to begin negotiations for site construction. Because Okatie did not own Indigo Plantation and the development was on hold pending the outcome of the lawsuit, Deline found no need for Okatie to contract with Southeastern for site preparation. After reviewing Okatie's accounts, Deline discovered that Covelli misappropriated nearly $800,000 in Okatie funds. Okatie filed a lawsuit against Covelli for return of the funds.

Southeastern called Covelli to testify. He avowed there was a specific agreement with Southeastern for Okatie to pay $85,000 as an advancement to Southeastern for future site preparation at Indigo Plantation at a reduced rate. However, he admitted that Southeastern was not really bound by the agreement to perform any actual work. Covelli's 1999 affidavit professed that the $85,000 was "not conditioned upon performance of the horizontal construction by [Southeastern], nor was it a loan, nor did [Southeastern] agree to repay the money in the event that the work was not performed or not requested."

The circuit court found the testimony presented in support of Southeastern was not credible. Referring to the documents submitted by Southeastern, including Viljac's affidavit and the tax returns, the court concluded Southeastern treated the

$85,000 as a loan. The court treated the money as a loan and determined the money was a loan payable on demand as a result of there not being a due date. The court further found that even if a contract existed with the terms Southeastern proposed, the contract would be unenforceable on the basis that it was unconscionable and "illusionary." The court held that Okatie was entitled to a judgment of $85,000 plus pre-judgment interest, and ruled Southeastern would be unjustly enriched if it did not pay Okatie the judgment.

### STANDARD OF REVIEW

This case concerns an action for money had and received. "The action is at law for money had and received but it is well-settled that equitable principles govern." *Town of Bennettsville v. Bledsoe*, 226 S.C. 214, 218, 84 S.E.2d 554, 556 (1954); *accord McDonald's Corp. v. Moore*, 237 F.Supp. 874, 877 (W.D.S.C.1965). In an action at law, tried without a jury, the appellate court standard of review extends only to the correction of errors of law. *Barnacle Broad., Inc. v. Baker Broad., Inc.*, 343 S.C. 140, 146, 538 S.E.2d 672, 675 (Ct.App.2000); *Snell v. Parlette*, 273 S.C. 317, 322, 256 S.E.2d 410, 412 (1979).

### ISSUES

I. Did the circuit court err in finding the $85,000 advanced to Southeastern by Okatie was a loan payable on demand?

II. Did the circuit court err in permitting Okatie to impeach its own witness?

III. Did the circuit court err in ruling the agreement was contrary to the evidence produced at trial?

### LAW/ANALYSIS

### I. MONEY HAD AND RECEIVED/IMPLIED BY LAW CONTRACT/QUASI–CONTRACT

An action for money had and received exists where a defendant has money belonging to the plaintiff which in equity should be repaid to the plaintiff. *Jackson v. White*, 194 F. 677

(4th Cir.1912); 42 C.J.S. *Implied Contracts* § 11 (1991). "In order to recover on a count for money had and received, ... the plaintiff must show he has equity and conscience on his side, and that he could recover in a court of equity." *Marvin v. McRae,* 24 S.C.L. (Rice) 171, 176–77 (1839); *accord Cary v. Curtis,* 44 U.S. 236, 247, 3 How. 236, 11 L.Ed. 576 (1845); *see also Bledsoe,* 226 S.C. at 218, 84 S.E.2d at 556 (in an action for money had and received, contractor was not entitled in equity and good conscience to retain the overpayment which would result in contractor's unjust enrichment at the city's expense). Examples of when an action for money had and received will lie are when the plaintiff paid money to the defendant under an unenforceable contract or where the defendant received money from the plaintiff for a special purpose and the money has not been applied to the purpose, the specific purpose has been abandoned, or the specific purpose cannot be carried out. 42 C.J.S. *Implied Contracts* §§ 14 and 19 (1991). Once the requirements of an action for money had and received are proven, the equitable principles of unjust enrichment and restitution provide a remedy. 42 C.J.S. *Implied Contracts* § 5 (1991). An action for money had and received is based upon a quasi-contract or a contract implied in law. *King County v. Odman,* 8 Wash.2d 32, 111 P.2d 228, 229 (1941); 66 Am.Jur.2d *Restitution and Implied Contracts* § 172 (2001). The recent development in the law in regard to an action in this nature is academically reviewed with certitude in *Myrtle Beach Hospital, Inc. v. City of Myrtle Beach,* 341 S.C. 1, 532 S.E.2d 868 (2000). Our supreme court, in critiquing prior precedent in this area, concluded "quantum meruit, quasi-contract, and implied by law contract are equivalent terms for an equitable remedy." *Id.* at 8, 532 S.E.2d at 872. In addition, the court adopted the *"Scudder May* test as the sole test for a quantum meruit/quasi-contract/implied by law claim." *Id.* at 9, 532 S.E.2d at 872. This test mandates: (1) a benefit conferred by plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value. *Id.* at 8–9, 532 S.E.2d at 872 (citing *Columbia Wholesale Co. v. Scudder May, N.V.,* 312 S.C. 259, 440 S.E.2d 129 (1994)).

■ In theory and actual practice, an action for money had and received is subsumed and amalgamated under the theories of quantum meruit/quasi-contract/implied by law actions. *See id.* Whereas the action for money had and received is founded upon a quasi-contract or a contract implied in law, we are bound by and apply with exactitude *Myrtle Beach Hospital, Inc.* to the case *sub judice.*

## II. SUFFICIENT EVIDENCE

■ Southeastern argues the court erred in holding the verbal agreement was a loan payable on demand because there was no evidence to support the court's decision. We disagree.

Okatie alleged in its complaint that the $85,000 was money advanced, without its knowledge, to Southeastern as a loan or as an advance payment for work to be done at Indigo Plantation. The circuit court found this was an action for money had and received or money lent.

■ Southeastern's tax documents and financial statements showed that it originally treated the $85,000 as a *loan* from Okatie in 1997. On various occasions, DeSimone informed Okatie's shareholders that he would return the money, that he thought the money was from Covelli, or that there was an agreement with Covelli which, in sum, did not require Southeastern to return the money. After the trial judge, who was able to observe the witnesses, found both Viljac's and Covelli's testimony not credible with regard to the contract, the judge relied upon the tax documents and Viljac's statement in his original affidavit. Southeastern, which failed to perform any work for Okatie, should have returned the funds "in equity and good conscience" when Okatie disbanded. Applying the *Scudder May* test to this quasi-contract or contract implied by law, we find in favor of Okatie. Okatie conferred a benefit upon Southeastern by advancing Southeastern $85,000. Southeastern indubitably realized the benefit by accepting and depositing the two checks. Retention of the $85,000 by Southeastern is inequitable if Southeastern does not repay the amount to Okatie because it never rendered services or money to Okatie. Based on our standard of review, we find there was sufficient evidence to support the circuit court's finding

that Okatie proved their action for money had and received. Further, in view of the fact that no time was set for repayment of the loan, the circuit court correctly held it was a loan payable on demand.

## III. IMPEACHING A WITNESS

 Southeastern argues the court erred in allowing Okatie to impeach Viljac's testimony regarding the terms of the agreement. We disagree.

Prior to the adoption of the South Carolina Rules of Evidence, the law provided that a party could not impeach its own witness. *See State v. Russ*, 208 S.C. 449, 452, 38 S.E.2d 385, 386 (1946) ("Generally, a party cannot impeach a witness he has introduced, either in a criminal case or a civil case."). One exception to the rule was where the witness' testimony took the party by surprise. *See Gilfillan v. Gilfillan*, 242 S.C. 258, 261, 130 S.E.2d 578, 580 (1963) ("Contradictory statements may not be used to impeach a party's own witness except upon a showing of surprise."); *Hicks v. Coleman*, 240 S.C. 227, 230, 125 S.E.2d 473, 474 (1962) (In order for a party to impeach his own witness based on surprise, it must appear "that the party has been actually surprised by the testimony of such witness, or that he has been deceived or entrapped into introducing the witness because of such contradictory statements."). Further, a party was generally bound by the testimony of that witness. *See Crider v. Infinger Transp. Co.*, 248 S.C. 10, 17, 148 S.E.2d 732, 735 (1966).

 Enacted in 1995, Rule 607, SCRE provides: "WHO MAY IMPEACH. The credibility of a witness may be attacked by any party, including the party calling the witness." Rule 607, SCRE. Parties may attack the credibility of their own witnesses without having to show surprise. *Id.*

The Note to the rule edifies in regard to the change in courtroom practice. The former law in this state mandated that a party vouch for its own witness and could not impeach its witness unless the witness was declared hostile upon a showing of actual surprise.

In contrariety to former law, Rule 607 inculcates the Bench and Bar that the credibility of a witness may be attacked by

any party, including the party calling the witness. Southeastern cites pre-Rules of Evidence cases to support its contention that Okatie could not impeach its witness, Viljac, and was bound by Viljac's testimony. Although Okatie presented Viljac as its witness, it was certainly able to impeach him. Concomitantly, Okatie had no way to establish the necessary facts in the case other than to call the involved parties to the stand. Okatie's examination of Viljac exposed problems with his credibility. Using other evidence in the case, such as Viljac's affidavit and the tax returns, Okatie was able to show that Southeastern considered the $85,000 a loan. Thus, Okatie was not bound by Viljac's testimony, and it merely sought to show Viljac's bias through his testimony. Based on Rule 607, SCRE, this type of impeachment is proper.

## IV. INTERPRETATION OF THE AGREEMENT

Southeastern proclaims that Okatie produced no evidence to refute Covelli's and Viljac's testimony regarding the terms of the verbal agreement. Thus, Southeastern maintains the circuit court erred in concluding the agreement was different from the evidence produced at trial. We disagree.

"The fact that testimony is not contradicted directly does not render it undisputed." *Black v. Hodge*, 306 S.C. 196, 198, 410 S.E.2d 595, 596 (Ct.App.1991) *accord Terwilliger v. Marion*, 222 S.C. 185, 72 S.E.2d 165 (1952); *Ross v. Paddy*, 340 S.C. 428, 434, 532 S.E.2d 612, 615 (Ct.App.2000). The court is not required to accept undisputed evidence as establishing the truth where there is reason for disbelief. *Johnson v. Painter*, 279 S.C. 390, 392, 307 S.E.2d 860, 861 (1983).

This is especially true where the court finds the unchallenged testimony not convincing. Credibility determinations regarding testimony are a matter for the finder of fact, who has the opportunity to observe the witnesses, and those determinations are entitled to great deference on appeal. *South Carolina Dep't of Soc. Serv. v. Cummings*, 345 S.C. 288, 293, 547 S.E.2d 506, 509 (Ct.App.2001); *Dorchester County Dep't of Soc. Serv. v. Miller*, 324 S.C. 445, 452, 477 S.E.2d 476, 480 (Ct.App.1996); *South Carolina Dep't of Soc. Serv. v. Forrester*, 282 S.C. 512, 516, 320 S.E.2d 39, 42 (Ct.App.1984).

Despite the fact that Covelli and Viljac were the only parties to testify regarding their "agreement," the circuit court in the present case found both Covelli and Viljac unbelievable. Because the court was in a better position to view the witnesses and judge their trustworthiness, we must give great deference to those findings. Neither the court nor Okatie was bound by Covelli's and Viljac's "uncontradicted" testimony that Southeastern was entitled to keep the money. There was other evidence in the record to support the court's judgment that the transaction actually amounted to money had and received or money lent (an implied by law contract/quasi-contract). Accordingly, we find no error.

## CONCLUSION

Based on the foregoing, the order of the circuit court is **AFFIRMED.**[2]

HEARN, C.J., and CURETON, J., concur.

---

2. We affirm on these grounds; therefore, we need not address the remaining issue on appeal.