THIS OPINION HAS
 NO PRECEDENTIAL VALUE AND SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY
 PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 John R.
 Marceron and Jeanne M. Marceron, Respondents,
 v.
 J. Reese Helms
 and Brenda Helms, Appellants.
 
 
 

Appeal From Horry County
 J. Stanton Cross, Jr., Master-In-Equity
Unpublished Opinion No.  2007-UP-542
Heard June 6, 2007  Filed November 30,
 2007  
AFFIRMED

 
 
 
 Carl Scott Masel, of Myrtle Beach, for Appellants.
 Mason Summers and Charles E. Carpenter, Jr., both of Columbia, for
 Respondents.
 
 
 

PER CURIAM:   Reese
 and Brenda Helms appeal the master-in-equitys denial of their motion for
 non-suit claiming John and Jeanne Marceron failed to prove that the Helms breached
 the contract between the parties or that they suffered any damages as a result. 
 We affirm.
FACTS
The Helmses were the owners of a home located on a lot they leased inside of Ocean
 Lakes Family Campground (Ocean Lakes).[1] 
 The Helmses decided to subdivide their lease site (MH9) into three separate lease
 sites (MH9-A, MH9-B, and MH9-C).[2] 
 The Helmses hired a surveyor to survey their lease site to ensure that each new
 site would meet Ocean Lakes minimum size requirement.  
In the summer of 2003, the Marcerons and the Helmses began
 discussing the possibility of the Marcerons purchasing the lease rights to
 MH9.  As a result of these discussions, on June 7, 2004, the Marcerons entered
 into a contract with the Helmses to purchase MH9-C for $90,000.00.  The
 contract required the Helmses to provide a survey of MH9-C and gave the
 Marcerons a right of first refusal for MH9-A and MH9-B.  The contract provided
 that the closing would occur on June 8, 2007, and that MH9 would be subdivided
 to create MH9-C on or before October 1, 2004.  Also on June 7, 2004, John
 Marceron and Reese Helms met with Wayne Peeler, a builder the Helms had
 contacted about constructing a home on the site, at the lease site to ensure
 the proposed home would fit on the site.  At this meeting, Reese Helms gave John
 Marceron a survey of MH9 with the proposed subdivided lots marked on it. It is
 undisputed that this survey did not accurately depict the size of MH9-C or its
 existing boundaries as set by Ocean Lakes.  The
 inaccuracy in the survey was due to an earlier shifting of the boundary lines
 by Ocean Lakes to resolve a dispute with an adjoining neighbor.  The moving of
 the boundary lines resulted in an overall increase in the square footage of
 MH9-C and decrease in the lake frontage of MH9 as a whole.  Following the meeting, the Marcerons
 purchased the lease rights to MH9-C from the Helmses for the agreed upon price.
By letter dated June 15, 2004, Reese Helms informed the Marcerons he
 had received an offer of $180,000.00 for the lease rights to the remaining
 portions of MH9 and gave them until June 27, 2004 to exercise their right of
 first refusal by matching the offer.  By letter dated June 23, 2004, the
 Marcerons informed the Helmses they would purchase the lease rights to all of
 MH9 for the price of $260,000.00 and the earlier payment of $90,000.00 should
 be treated as a prepayment towards this transaction.  The letter also expressly
 stated: This [agreement] does not change any agreement per our original
 contract on June 7, 2004.  On July 2, 2003, the Marcerons paid the Helms the
 agreed upon amount and received a written lease from Ocean Lakes for MH9. 
 
The Marcerons claim they were not aware of the previous change in
 the boundary line until after their purchase of the lease rights.  After
 unsuccessfully attempting to resolve the boundary line issue with the Helms and
 Ocean Lakes, the Marcerons initiated this current action on October 18, 2004. 
 The Marcerons alleged the following causes of action: breach of contract;
 negligent misrepresentation; fraud; and breach with fraudulent intent.  The
 Marcerons sought damages in the amount of the difference between the values of
 the site as represented in the survey and the site as actually conveyed,
 punitive damages, and reasonable attorney fees and costs for the action.  By
 consent, the case was referred to the Horry County Master in Equity, J. Stanton
 Cross, Jr.  The matter was heard at trial on March 30, 2006.  At the conclusion
 of the Marcerons case, the Helms moved for a directed verdict on all issues. 
 The Master informed the Helms that they were really seeking an involuntary
 nonsuit, treated their motion as such, and denied their motion.  By final order
 filed June 9, 2006, the Master found in favor of the Marcerons for breach of
 contract and awarded damages in the amount of $26,000.00 which represented the
 difference in the value of the lot as contracted and the value of the lot as
 conveyed.  The Helms now appeal the Masters denial of their motion for
 involuntary nonsuit claiming the Marcerons failed to prove the Helms breached
 the contract between the parties or that they suffered any damages as a result.  
 
STANDARD OF
 REVIEW
We
 note initially that while the Helms motion at the close of the evidence was
 couched as a directed verdict motion, governed by Rule 50, SCRCP, this was a
 non-jury action.  Rule 50, SCRCP, as noted by the master, is only applicable to
 jury trials.  The proper motion for the Helms to have made was a motion for
 involuntary non-suit under Rule 41(b), SCRCP.  After the plaintiff in an
 action tried by the court without a jury has completed the presentation of his
 evidence, the defendant, . . . may move for a dismissal on the ground that upon
 the facts and the law the plaintiff has shown no right to relief. Rule 41(b),
 SCRCP.  Rule 41(b), SCRCP, allows the judge as fact finder to weigh the
 evidence, determine the facts and render a judgment
 against the plaintiff at the close of his case if justified.  Johnson
 v. J.P. Stevens & Co., 308 S.C. 116, 118, 417 S.E.2d 527, 529 (1992). 
 
In
 reviewing the rulings of a trial judge on motions for involuntary nonsuit, this
 Court must review the evidence and all inferences in the light most favorable
 to the nonmoving party.  Rewis v. Grand Strand Gen. Hosp., 290 S.C. 40, 41-2, 348 S.E.2d 173, 174 (1986). If more than one
 reasonable inference can be drawn from the evidence, the motion for nonsuit
 must be denied.  Id.  In deciding a motion for nonsuit, the trial court
 must view the evidence and all reasonable inferences in the light most
 favorable to the plaintiff.  Bullard v. Ehrhardt, 283 S.C. 557, 558, 324
 S.E.2d 61, 61 (1984). If there is no relevant competent evidence reasonably
 tending to establish the material elements of the plaintiffs case a motion for
 nonsuit must be granted.  Id.
A
 breach of contract seeking money damages is an action at law.  South Carolina Fed. Sav. Bank v. Thornton-Crosby Dev. Co., 310 S.C. 232, 235,
 423 S.E.2d 114, 116 (1992).  On appeal of an action at law tried without a
 jury, the findings of fact of the trial court will not be disturbed unless
 found to be without evidence which reasonably supports the trial courts
 findings. The rule is
 the same with or without a reference.  Townes
 Assocs., Ltd. v. City of Greenville, 266 S.C. 81, 86, 221 S.E.2d 773, 775
 (1976). The trial courts findings are equivalent to a jurys findings in a law
 action.  Chapman v. Allstate Ins. Co., 263 S.C. 565, 567, 211 S.E.2d
 876, 877 (1975).  This courts role is to determine whether any evidence
 reasonably supports the factual findings of the trial court.  Townes
 Assocs., Ltd., 266 S.C. at 86, 221 S.E.2d at 776.  Additionally, the
 appellate court can correct errors of law. Okatie River, L.L.C. v. Southeastern Site Prep, L.L.C., 353 S.C. 327, 334, 577 S.E.2d 468,
 472 (Ct. App. 2003). 
While
 the facts of this particular case are unique, the standard of review applies
 and operates here like in any other case.  Accordingly, if there was any
 evidence or reasonable inference to reasonably support the Macerons case, we
 must affirm the Masters denial of the Helmses motion for involuntary
 nonsuit.  Likewise, if there is any evidence in the record which reasonably supports
 the Masters final determination, we must affirm.
LAW/ANALYSIS
In
 an action for breach of contract, the plaintiff must prove the existence of a
 contract, its breach, and damages caused by the breach.  See Baughman
 v. Southern Ry. Co. 127 S.C. 493, 121 S.E. 356, 356 (1924).

 The contract for MH9-C provided:
 
 Conveyance Shall Be Made subject to all easements as well as covenants of record (providing
 they do not make title unmarketable) and all governmental [statutes],
 ordinances, rules and regulations: A survey map of leased lot 9C, section MH
 shall be provided by the seller prior to the closing date.
 

(Bolded in the
 original).  The Helmses claim this requirement does not apply because it was
 included in the contract for the lease rights to MH9-C and not in the agreement
 for MH9 in its entirety.  However, included in the letter in which the
 Marcerons exercised their right of first refusal to the remainder of MH9 is a
 provision that states: This does not change any agreement per our original
 contract. . . .  Furthermore, it is clear that the parties, while contracting
 for MH9-C, had considered a transfer of MH9 in its entirety.  The contract for
 MH9-C included the right of first refusal for the remainder of MH9 and the
 survey provided as part of the transaction for MH9-C was a survey of MH9 in its
 entirety. Accordingly, there is evidence in the record to support the Masters
 finding that the Helmses were required to provide a survey as part of the
 contract for MH9.
Implicit in the requirement to provide a survey is the requirement
 that the survey which is provided be an accurate survey.  Common sense and good faith are the
 leading touchstones of construction of the provisions of a contract; where one
 construction makes the provisions unusual or extraordinary and another
 construction which is equally consistent with the language employed, would make
 it reasonable, fair and just, the latter construction must prevail.  C.A.N. Enters., Inc. v. South Carolina Health &
 Human Servs. Fin. Comn  296
 S.C. 373, 377, 373 S.E.2d 584, 586 (1988) (citing Farr v. Duke Power Co., 265 S.C. 356, 360, 218 S.E.2d 431, 434 (1975)).  It is undisputed that the survey
 provided by the Helmses was inaccurate.  
During
 the trial, Reese Helms testified that at the meeting, he informed John Maceron
 of the inaccuracy of the survey due to an earlier shifting of the boundary
 lines by Ocean Lakes to resolve a dispute with an adjoining neighbor.  Brenda
 Helms testified that she discussed the shift in the boundary line with John
 Marceron on the day of the meeting.  Wayne Peeler testified that Reese Helms
 informed John Marceron at the meeting that the boundary line had been moved. 
 He also testified that the measurements the three men used to lay out the home
 site reflected the change in the boundary line.  However, John Marceron
 testified that he was unaware of the inaccuracy of the survey or the change in
 the boundary line.  
Despite
 the conflicting testimony, the Master found the Marcerons were unaware of the
 inaccuracies in the survey.  Although John Marcerons testimony conflicts with other evidence in the record, our
 standard of review dictates that we affirm if any evidence exists in the record
 to reasonably support the findings of the Master and does not allow us to weigh
 the evidence. Accordingly, we find evidence to support the Masters finding
 that Marcerons were unaware of the inaccuracies in the survey.  See Sherman v. W & B Enters., Inc. 357 S.C. 243, 250, 592 S.E.2d 307,
 310 (Ct. App. 2003). 
The Helmses
 argue that because the dimensions and boundaries of lots in Ocean Lakes are subject to change conferring lease rights to sites of set dimensions is
 impossible.  We are not persuaded by this argument.  By the terms of the
 contract, the Helmses agreed to provide a survey of the lot to be conveyed. The
 inaccuracies in the survey were material to the contract because the survey
 provided the only means by which the Marcerons could determine the land of
 which they were purchasing the lease rights.  The moved boundary line served as
 the boundary between the MH9 and the adjoining lease site.  Accordingly, the
 physical change to the boundary line which was not reflected in the survey
 equally affected lot MH9 in its entirety and the proposed lot MH9-C.   
The
 Helms claim that because the value of the lease site now exceeds the amount the
 Marcerons paid, the Marcerons cannot show any resulting damages.  This argument
 is unpersuasive.  In a breach of contract action, damages serve to place the
 nonbreaching party in the position he would have enjoyed had the contract been
 performed.  South Carolina Federal Sav. Bank v. Thornton-Crosby
 Development Co., Inc.  303 S.C. 74, 77, 399 S.E.2d 8,10 - 11 (Ct.
 App.1990).  The Marceron sought damages based on the correct measure: the
 difference in the value of the lot as contracted for and the value of the lot
 as conveyed. 
In South Carolina, a property owner is competent to offer testimony as to the value of his property. Abercrombie v. Abercrombie, 372 S.C. 643, 647,
 643 S.E.2d 697, 699 (Ct. App. 2007) (citing Cooper v. Cooper, 289
 S.C. 377, 379, 346 S.E.2d 326, 327 (Ct. App. 1986)).  The rule that a property
 owner is competent to present an opinion as to the propertys value is well
 recognized. Lewis v. South Carolina State Highway Dept., 278 S.C. 170,
 173, 293 S.E.2d 434, 436 (1982). 
John
 Marceron testified that the value of the lease site was based heavily on the
 amount of lake frontage the lot had.  He testified that the lot as represented
 in the survey had a total of 153 feet of lake frontage, but the lot as conveyed
 only had 138 feet of lake frontage.  He testified that the difference between
 the two measurements equaled ten percent of the total lake frontage as
 represented in the survey.  He also testified that the increase in the total
 amount of square footage did not increase the value of the lease site.  He
 stated the additional land was valueless to him because it was made up of a
 roadway and an unsightly berm.  He also testified that the total purchase price
 for MH9 was $260,000.00 and explained that he was seeking ten percent of the
 total purchase in damages as result of the reduction in lake frontage.  Accordingly,
 there is evidence in the record support the Masters findings as to damages.      
CONCLUSION
For the
 reasons stated above, the order of the Master is
AFFIRMED.
STILWELL, SHORT, and WILLIAMS JJ., concur.

[1] The lots located inside Ocean Lakes are referred to
 as lease sites because they are owned by Ocean Lakes and are leased to
 individuals who construct or position homes upon them.  Ocean Lakes, at all times, retains the right to adjust and move the boundary lines of any and all
 lease sites.  Accordingly, the lease sites do not have permanently set boundary
 lines.       
[2] Ocean Lakes allows individuals to subdivide their
 lease sites as long as each proposed site will have at least 3,000 square feet
 based on the existing boundaries as set by Ocean Lakes.